## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| VLADIMIR CHEBOTNIKOV, | ) | |
| EUGENE PANTYUKHIN, and YOGESH | ) | |
| SHARMA, on behalf of themselves | ) | |
| and others similarly situated, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No.** |
| **v.** | ) | **14-13475-FDS** |
| | ) | |
| LIMOLINK, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a putative class action alleging violations of Massachusetts wage laws and the Fair Labor Standards Act ("FLSA"). Defendant LimoLink, Inc., is a company that, in substance, provides a platform for customers seeking to use limousine services. Plaintiffs are three limousine drivers who operate their own limousine companies and, through those companies, contracted with LimoLink to provide limousine services to its customers. The contracts included various restrictions and requirements, including adherence to certain standards set by LimoLink. Plaintiffs allege that LimoLink violated state and federal wage laws by improperly classifying them as independent contractors, failing to pay them overtime compensation, and failing to distribute to them all gratuities paid by its customers.

The parties have filed cross-motions for summary judgment. For the following reasons, the motions will be granted in part and denied in part.

## I.  Background

### A.  Factual Background

Unless otherwise noted, the following facts are undisputed.

#### 1.  The Parties

##### a.  LimoLink

LimoLink, Inc. is a corporation headquartered in Marion, Iowa, that does business across the United States and internationally.  (Vittetoe Dep. at 23).

As set forth in more detail below, LimoLink contracts with drivers or fleet operators who own limousines and who are willing to accept customer requests for transportation.[1]  LimoLink provides a mobile application that permits customers to reserve and obtain the limousine services.  It also provides related services, such as notifications and GPS monitoring (so that, for example, the passenger and the driver know where each other are prior to pickup).  (*See* West Dep. at 51; Vittetoe Dep. at 22, 31).  The contracts also require, among other things, that limousine drivers adhere to certain service standards.

LimoLink does not own any of the vehicles, all of which are provided by vendors under contract.  LimoLink's vendors include "large fleets" of 50 to 100 vehicles, "medium fleets" of five to 50 vehicles, and "small fleets," sometimes referred to as "independent operators," of one to five vehicles and often only a single driver.  (Vittetoe Dep. at 7; West Dep. at 65).

LimoLink has a Service Provider Agreement that it presents to all vendors.  (Vittetoe Dep. at 49-52).  The agreement provides, among other things, that LimoLink will perform all billing activities and that the service providers will meet certain standards of operation, be available 24 hours a day and seven days a week, and will not subcontract or "farm out"

---

[1] Although it appears that at least some of the vehicles are simply black sedans, this opinion will refer to them as "limousines" for the sake of convenience.

reservations received through LimoLink. It also provides that the agreement may be terminated

by either party with thirty days' written notice or by LimoLink at any time without notice upon

breach of the agreement's terms, including "the failure of Service Provider to meet the high

standards of service required by participation in the LimoLink Reservation Network." (Hupfeld

Aff. Ex. 3).[2]

When customers contact LimoLink to make reservations for transportation services, one

of its 30 "Command Desk" employees then assigns the reservation to a vendor. (West Dep. at

14-15, 51; Vittetoe Dep. at 22). Reservations are assigned in one of several ways. In markets

with only one vendor, the reservation is passed directly to that vendor by e-mail. (Vittetoe Dep.

at 164). In markets with multiple vendors, reservations are automatically placed in an online

"marketplace" where vendors can select the reservations that they want to accept. (*Id.*; West

Dep. at 17). Alternatively, "Command Desk" employees may manually offer reservations to

particular vendors, either by a telephone call to that vendor or a text or e-mail. (Vittetoe Dep. at

164-65; West Dep. at 17).

According to LimoLink, it does not require vendors to accept the reservations it offers

and does not restrict vendors from providing services to non-LimoLink customers. (Vittetoe

Dep. at 66-67, 164-65; West Dep. at 28).[3]

LimoLink prefers to assign reservations to its independent operators (that is, the vendors

---

[2] According to LimoLink, the terms of agreement may be modified based on negotiations between LimoLink and its vendors as to matters such as the rates to be paid to drivers. (Vittetoe Dep. at 49-50). Plaintiffs dispute the extent to which the rates paid by LimoLink could actually be negotiated. Pantyukhin testified that when he tried to negotiate a higher base rate, he was moved to the bottom of LimoLink's "pecking order" and received fewer reservations. (Pantyukhin Dep. at 136). Sharma testified that when he attempted to negotiate with LimoLink concerning the amount to bill for a particular trip, LimoLink refused to negotiate and took that reservation away from him. (Sharma Dep. at 166).

[3] Plaintiffs dispute that LimoLink does not require vendors to accept reservations. According to plaintiffs, LimoLink would stop offering them reservations if they refused to accept any that were offered. (Pantyukhin Dep. at 147-52; Sharma Dep. at 12-13; Chebotnikov Dep. at 171-72).

with small fleets) because they become more familiar with its operations and it can exercise more "quality control" over them. (Vittetoe Dep. at 41, 119; West Dep. at 63-64, 92-93). However, approximately two-thirds of LimoLink's vendors are medium or large fleets. (Vittetoe Aff. ¶ 10).

### b. <u>Plaintiff Pantyukhin</u>

Eugene Pantyukhin entered the limousine business in early 2007, when he began driving for a transportation company in Everett, Massachusetts. (Pantyukhin Dep. at 11). Later that year, he started his own company, East Coast Limousine Transportation ("ECL"). (*Id.*).

Pantyukhin drives for ECL, and describes himself as its "manager"; he does "everything to run the company," including answering phones, booking reservations, billing customers, and making budgetary decisions. (*Id.* at 17, 19, 31, 42). For part of 2010, Pantyukhin employed one other individual to drive an extra car. (*Id.* at 16). He paid that employee $15 or $16 per hour. (*Id.* at 16). In addition, when he books jobs for ECL that he cannot perform himself, he refers, or "farms out," those jobs to other drivers with their own independent limousine companies. He refers to those drivers as his "affiliates," and pays them some portion of the payments received from the customers. (*Id.* at 18-19, 167-68). However, he never "farmed out" jobs that he received through LimoLink. (*Id.* at 168).

Pantyukhin owns and maintains the vehicles that he drives in connection with ECL, and purchases the gasoline. (*See id.* at 42-43). ECL maintains a $1 million insurance policy on the vehicles, as well as the permits required to pick up passengers at Logan Airport. (Def. SMF ¶ 34; Pantyukhin Dep. at 87-88). ECL also maintains its own business telephone number and website. (Pantyukhin Dep. at 21-22). Since 2008, ECL has advertised through "pay per click" ads on Google in order to increase its customer base; it has also tried various other advertising

strategies. (*Id.* at 89-90).

In January 2013, ECL, through Pantyukhin, entered into a contract with LimoLink as a service provider by signing the standard LimoLink Service Provider Agreement. (Hupfeld Aff. Ex. 3). ECL received $54,418 from LimoLink for services provided in 2013, $44,299 for services provided in 2014, and $3,414 for services provided in 2015. (Def. SMF ¶ 45; Hupfeld Aff. Ex. 5).

Prior to working with LimoLink, ECL performed contract work for two different transportation companies. (Pantyukhin Dep. at 12-15). By 2013, that contract work had ceased. (*Id.*).

Before, during, and after the time that ECL performed work for LimoLink, it also provided a substantial number of rides, through either Pantyukhin or one of his affiliates, for non-LimoLink customers. (Pantyukhin Dep. at 98-99, 100-01, 166-67; Norton Aff. Ex. 15). ECL received approximately $127,562 from other limousine companies and clients in 2013, $124,690 in 2014, and $35,258 during the first quarter of 2015. (Norton Aff. Ex. 15).

### c. Plaintiff Sharma

After several years driving a Boston taxicab, Yogesh Sharma incorporated a limousine company, Maya Limo, Inc., in 2009. (Sharma Dep. at 6-7). Like ECL, Maya owns, maintains, and insures its own vehicles. (Sharma Dep. at 53, 73). From 2009 to 2011, Maya received its business from a chauffeur company in Braintree, Massachusetts. (*Id.* at 27).

Sharma serves as the owner and operator of Maya. (Sharma Dep. at 11-12, 38). In 2013, he "brought in" a friend named Mumtaz Siddiqui to serve as the secretary and director of Maya. (*Id.* at 9, 39). Siddiqui handles the accounting, as well as occasional repairs, associated with a car that Maya leases to an Uber driver. (*Id.* at 39). Sharma directs Siddiqui regarding "how to

do the work, [but] not what to do." (*Id.*).  Between 2013 and 2015, Siddiqui received a salary from Maya, and he was compensated as an officer in 2014.  (Norton Aff. Ex. 18).

In 2011, Maya, through Sharma, entered into a contract with LimoLink by signing its standard Service Provider Agreement.  (Sharma Dep. at 27; Smit Aff. Ex. 6).  From 2011 through March 2013, LimoLink was the only source of Maya's limousine business.  (Sharma Dep. at 27).

In 2012, at LimoLink's request, Sharma covered some jobs for another LimoLink driver, Muhammad Irfan, whose mother was ill.  (*Id.* at 112-17).  For those jobs, Sharma drove Irfan's vehicle but received payment into Maya's LimoLink account.  (*Id.*).  Sharma then compensated Irfran for the use of the vehicles and gas.  (*Id.* at 114).  No driver other than Sharma performed any LimoLink job on behalf of Maya.  (Sharma Resp. to Interrog. at ¶ 16).

In March 2013, Maya began doing some work for other limousine companies.  It stopped all work for LimoLink in September of that year.  (*Id.* at 28).  150

### d.  <u>Plaintiff Chebotnikov</u>

In 2000, Vladimir Chebotnikov started V&M as a d/b/a medical transportation company.  (Chebotnikov Dep. at 9-10, 18).  He operated V&M for approximately seven years, employing up to ten drivers.  (*Id.* at 10-12).  After losing several contracts, Chebotnikov filed for bankruptcy in 2007.  (*Id.* at 17-18).

Around 2006, Chebotnikov purchased a limousine and began doing contract work for several limousine companies.  (*Id.* at 21-22).  It appears that Chebotnikov personally owned and insured the vehicles he drove for V&M.  (*See id.* at 21, 23, 107-115).  In 2008, V&M, through Chebotnikov, entered into a contract with LimoLink by signing its standard Service Provider Agreement.  (*Id.* at 39; Hupfeld Aff. Ex. 12).

V&M formally incorporated, under the same name, in 2011. (Chebotnikov Dep. at 42). Between 2011 and 2014, V&M, through either Chebotnikov or other "affiliates" to whom he "farmed out" jobs, also provided limousine services to other limousine companies and individual clients. (Norton Aff. Ex. 27 at No. 13). However, "no other drivers transported LimoLink clients on behalf of [Chebotnikov] . . . and V&M." (Chebotnikov Resp. to Interrog. at ¶ 16). V&M received approximately $7,012 from other limousine companies or individual clients in 2011, $15,096 in 2012, $14,580 in 2013, and $35,804 in 2014. (*Id.*). In 2014, LimoLink terminated its relationship with Chebotnikov following an argument concerning his payment. (Chebotnikov Dep. at 158).

In 2008, the same year that V&M entered into a contract with LimoLink, Chebotnikov and two partners formed Boston Executive Car Service ("BECS"), a limousine service company. (*Id.* at 30-31, 48-49). However, Chebotnikov was not involved with running BECS during the time that he was driving for LimoLink. (*Id.* at 56).

## 2. LimoLink's Standard Service Agreement and Policies

As noted, Chebotnikov, Pantyukhin, and Sharma all signed LimoLink's standard Service Provider Agreement, either personally or on behalf of their respective corporations. (Pl. Exs. 4, 5, 6). Under the terms of the agreement, vendors are prohibited from (1) subcontracting or "farming out" reservations received through LimoLink without its express, written authorization; (2) accepting payment directly from customers; (3) providing any services for LimoLink customers, except through LimoLink; and (4) releasing drivers from jobs "under any circumstances (excluding personal safety) without first contacting a LimoLink reservation specialist for direction." (Pl. Ex. 5).

The agreement requires vendors to review its "Chauffeur Standards" and to ensure that

all drivers comply with its requirements. (*Id.*). Under the Chauffeur Standards, drivers are required to wear dark suits with white (or other approved color) dress shirts, ties, be "neatly groomed," and wear "[n]eutral smelling deodorant and minimal cologne." (Pl. Ex. 7). Although not expressly stated in the Chauffeur Standards, LimoLink requests that all vendors wear a specific LimoLink tie when driving its customers. (Vittetoe Dep. at 94). It appears that LimoLink provided drivers with the LimoLink tie, but not any other clothing. (*See* Sharma Dep at 186).

LimoLink requires drivers to arrive at the designated pick-up location at least 15 minutes before the scheduled pick-up time. (Pl. Ex. 7). Drivers are required to greet passengers with a "[s]incere and genuine smile," a "[w]arm, brief introduction," and a "[s]incere offer to carry everything the passenger is carrying," while standing outside the vehicle near the rear passenger door. (Pl. Ex. 7).[4] The Chauffeur Standards suggest that drivers greet passengers in the following way: "Hello Mr. Smith. My name is John and I will be your LimoLink chauffeur today. May I carry your bag for you?" (*Id.*).

The Chauffeur Standards require that vendors maintain clean vehicles, with the "front passenger seat . . . moved all the way forward, providing maximum legroom for passenger in rear seat," and that they provide passengers with a newspaper and a bottle of water with a LimoLink label. (*Id.*). Drivers are required to sit "reasonably erect without excessive 'tilt back' of the driver seat," maintain two hands on the steering wheel, avoid personal phone calls while driving, and to drive in an "extremely smooth" manner that "creates no distractions for the passenger." (*Id.*).

LimoLink does not dictate what routes drivers use to take passengers to their destinations.

---

[4] For airport pickups, drivers are required to greet passengers with a LimoLink name board.

(Vittetoe Dep. at 177).

At the end of a trip, drivers are required to "[t]hank the passenger for travelling with LimoLink." (*Id.*). They are also required to check the vehicle for personal belongings and to remain at the drop-off site until the passenger is "safe and secure" at their destination. (*Id.*). Drivers are allowed to give passengers only LimoLink business cards. (*Id.*).

LimoLink's Vendor Reservation Confirmation and Revision forms, sent to drivers to communication reservation details, state that "[f]ailure to adhere to LimoLink policies and procedures may result in withholding of service fees," meaning payments to vendors. (Vittetoe Dep. at 205; Pl. Ex. 10).

### 3.      LimoLink's Quality Control Procedures

LimoLink uses a number of methods and procedures to ensure that its vendors meet its service standards. It communicates with vendors periodically by e-mail concerning additional requirements and restrictions, such as what vehicles it requires vendors to have in order to book reservations, and appropriate driver attire. For example, a September 2012 e-mail informed vendors that "[d]uring cold weather, the only acceptable coat is a black wool coat that extends down near the knees" and that the "[u]se of tables for name boards [would] be a required standard as of Jan 1, 2013." (Pl. Ex. 14 at 38). The e-mail also reminded vendors that "LimoLink's volume is very strong from early September thru mid-December" and that, while they could "[r]un [their] business however [they] wish," "[c]hoosing to not work during the busy season . . . seems to us to be an odd and costly decision to make." (*Id.*). The e-mail further noted that LimoLink "adjust[s its] service provider network based on the service provider availability that [it] observe[s] from day to day" and that vendors should "understand that [fact] as [they] schedule oil changes, holidays, etc." (*Id.*). An August 2014 e-mail informed vendors

that LimoLink would no longer accept the Lincoln Town Car "as an approved vehicle" after December 31, 2014, and listed its three "approved" sedans. (*Id.* at 34).

LimoLink employs a "Ground Management team" that travels to different markets to personally meet and vet as many of the drivers as possible. (West Dep. at 33-35). In addition, LimoLink employees will, when in different markets, observe passenger pickups of LimoLink customers and conduct "mystery rides" with vendors. (West Dep. at 135-36; Vittetoe Dep. at 93-100). During "mystery rides," LimoLink employees (or their friends or family) book rides with vendors and evaluate the driver's compliance with LimoLink policies. (Vittetoe Dep. at 99; Pl. Ex. 7). Feedback from the evaluation is provided to the vendor. (Vittetoe Dep. at 97). According to LimoLink, a score "under 90 indicates a need to either (A) urgently improve service levels, or (B) search for a replacement provider in a specific market." (Pl. Ex. 7). On at least some occasions, LimoLink will refuse to pay for "mystery rides" if the rider is handed a non-LimoLink business card. (*Id.*; Vittetoe Dep. at 98).

LimoLink ranks vendors in what it calls the "pecking order." (Vittetoe Dep. at 114). The "pecking order" is used to assign reservations, making more reservations available to vendors higher on the list. (*Id.* at 115, 171). The "pecking order" is determined based on seniority, vehicle age (with preference given to newer vehicles), vehicle make and model, and vendor size (with preference given to smaller vendors), as well as passenger feedback, employee observations, and prior instances of deviations from LimoLink policies. (West. Dep. at 86-88; Vittetoe Dep. at 129). According to plaintiffs, they would also be knocked down in the "pecking order" if they ever refused to accept reservations. (Chebotnikov Dep. at 171-173; Sharma Dep. at 12-14; Pantyukhin Dep. at 147-52).

LimoLink requires its vendors to use a four-step reservation-confirmation process. (West

Dep. at 100). First, vendors/drivers must confirm their initial receipt of a trip assignment. (Pl. Ex. 7). Second, vendors/drivers must confirm the reservation with LimoLink twelve hours in advance of the scheduled pick-up. (*Id.*). Third, vendors/drivers must confirm the reservation with LimoLink two hours in advance of the scheduled pick-up. (*Id.*). Those confirmations can all be done online. (*Id.*, West Dep. at 101). Finally, LimoLink conducts a "spot-time" call with the individual drivers shortly before a scheduled pick-up to ensure that the driver is on time for the pick-up and to review the details of the reservation, including the number of passengers and destination. (Pl. Ex. 7; West. Dep. 104).

### 4. Payment for Services Performed

The rates that LimoLink charges its customers and the rates at which it pays its vendors are separately determined and unrelated. (Vittetoe Dep. at 177, 194). For hourly reservations, LimoLink pays vendors a pre-established rate per hour, depending on the vehicle type. (*Id.* at 175, 179-80). For reservations based on distance (typically, between cities), LimoLink pays vendors a pre-established rate. (*Id.* at 175-76).

Prior to a change in policy in 2014, LimoLink added a gratuity charge to its customer invoices, usually 20% of the amount charged. (*Id.* at 192-93). LimoLink retained that gratuity charge as part of its general revenue stream. (*Id.* at 195-96). According to LimoLink, that money was used to enable it to "pay a better pay package and benefit package" to its employees. (*Id.* at 197). LimoLink separately negotiated with vendors concerning the gratuity that would be paid to them, which was typically 20% of the base rate paid to the vendor (as opposed to 20% of the charge paid by the customer). (*Id.* at 193).

### B. Procedural Background

The complaint in this action was originally filed on August 26, 2014, by plaintiff

Chebotnikov. The third amended complaint, which is a putative class action, also includes claims by Pantyukhin and Sharma and asserts seven counts: misclassification in violation of the Massachusetts Independent Contractor Statute, Mass. Gen. Laws ch. 149, § 148B (Count One); failure to pay overtime in violation of Mass. Gen. Laws ch. 151, § 1A (Count Two); violation of the Massachusetts Tips Law, Mass Gen. Laws ch. 149, § 152A (Count Three); violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, and the Massachusetts Minimum Wage Act, Mass. Gen. Laws ch. 151, § 1 (Count Four); misclassification in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203, *et seq.* (Count Five); failure to pay overtime in violation of FLSA (Count Six); and tip misappropriation in violation of FLSA (Count Seven).

LimoLink has moved for summary judgment on all claims. Plaintiffs have cross-moved for partial summary judgment on counts one (misclassification under the Massachusetts Independent Contractor Statute) and three (violation of the Massachusetts Tips Law).

## II.    <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d

905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256–57.

## III.    Analysis

### A.    Claims under Massachusetts Law

One of the principal disputes in this matter is whether, under Massachusetts law, the three plaintiffs were employees of LimoLink (in which case their compensation is covered by the wage statutes) or independent contractors (in which case it is not).  In Massachusetts, that issue is determined by statutory standards, not according to common-law principles.

The independent-contractor statute, Mass. Gen. Laws ch. 149, § 148B, "establishes a standard to determine whether an individual performing services for another shall be deemed an employee or an independent contractor for purposes of [the Commonwealth's] wage statutes." *Somers v. Converged Access, Inc.*, 454 Mass. 582, 589 (2009).  That statute therefore determines the viability of plaintiffs' substantive claims brought under chapters 149 and 151 (with the exception of the Tips Law claim, which applies regardless of whether an entity is an "employer or other person").  *See* Mass. Gen. Laws ch. 149, § 152A(b)-(d).

### 1.    Whether Plaintiffs Are Employees or Independent Contractors under Massachusetts Law

Under the independent-contractor statute, "an individual performing any service . . . shall be considered an employee" unless the purported employer can make three showings.  Mass. Gen. Laws ch. 149, § 148B(a); *see Depianti v. Jan–Pro Franchising Int'l, Inc.*, 465 Mass. 607, 621 (2013).  The three showings are the following:

13

> (1) "the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact";
>
> (2) "the service is performed outside the usual course of business of the employer"; and
>
> (3) "the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

Mass. Gen. Laws c. 149, § 148B(a)(1)-(3); *see Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 327 (2015). The purported employer must establish that all three requirements are satisfied; "[t]he failure to satisfy any prong will result in the individual's classification as an employee." *Sebago*, 471 Mass. at 327.

Defendant contends that plaintiffs do not fall within the scope of the independent-contractor statute because they did not provide services as "individuals," but rather as incorporated business entities. *See Debnam v. FedEx Home Delivery*, 2013 WL 5434142, at *1 (D. Mass. Sept. 27, 2013) (holding that plaintiff was an independent contractor because the work performed—employing up to nine separate drivers to operate nine delivery routes—"involved far more than his personal services" and he could not be considered an "individual within the meaning of § 141B"). However, there is no bright-line rule precluding those who contract through incorporated entities from being employees under Massachusetts law. *Anderson v. Homedeliveryamerica.com, Inc.*, 2013 WL 6860745, at *2 (D. Mass. Dec. 30, 2013). *See also Amero v. Townsend Oil Co.*, 2008 WL 5609064, at *3 (Mass. Super. Ct. Dec. 3, 2008) (noting that plaintiff's incorporation "does not automatically transform him into an independent contractor"). Rather, "[t]he inquiry is whether *in substance* the worker is an employee or a person (or entity) acting genuinely as an independent contractor." *Anderson*, 2013 WL 6860745, at *2.

The Massachusetts Attorney General has advised that the independent-contractor statute is not intended to affect "legitimate . . . business-to-business relationships in the Commonwealth." An Advisory from the Attorney General's Fair Labor Division on M.G.L. c. 149, s. 148B, 2008/1 ("Advisory 2008/1") at 5. As the Attorney General further explained:

> The difficulty arises when businesses are created and maintained in order to avoid the Law. The [Attorney General's Office] will enforce the Law against entities that allow, request or contract with corporate entities such as LLCs or S corporations that exist for the purpose of avoiding the Law. In these situations, the [Attorney General's Office] will consider, among other factors, whether: the services of the alleged independent contractor are not actually available to entities beyond the contracting entity, even if they purport to be so; whether the business of the contracting entity is no different that the services performed by the alleged independent contractor; or the alleged independent contractor is only a business requested or required to be so by the contracting entity.

*Id.*

Here, there is substantial evidence suggesting that plaintiffs were in legitimate business-to-business relationships with LimoLink. For example, two of the three incorporated entities existed both prior to and after their relationship with LimoLink. There is no evidence that LimoLink requested or required that the drivers establish separate businesses to avoid the reach of the statute. Each of the three entities, to varying degrees, provided services to other entities or individuals during the time in which they contracted with LimoLink. Other evidence, however, suggests that plaintiffs, as a practical matter, contracted as individuals rather than as businesses. For example, it appears that plaintiffs performed all services for LimoLink themselves, and did not "farm out" LimoLink jobs to other drivers.[5] And it is disputed whether the agreements themselves were negotiable, which may also bear on the issue of whether there was a legitimate business-to-business relationship.

---

[5] Pantyukhin explicitly testified that he did not "farm out" any LimoLink jobs. (Pantyukhin Dep. at 168). In his response to interrogatories, Sharma stated that "[o]ther drivers did not transport LimoLink clients on behalf of Plaintiff and/or Maya Limo, Inc." (Sharma Resp. to Interrog. at ¶ 16).

Furthermore, and in any event, even if the statutory presumption that the drivers are employees applies, there are disputed issues of material fact as to whether LimoLink can establish the facts necessary to overcome the presumption. For example, whether the drivers were "free from control and direction" of LimoLink "in connection with the performance of the service" is a matter of some dispute. Most notably, it is disputed whether the drivers were free to accept or reject particular jobs; an employee, as opposed to an independent contractor, is not typically permitted to refuse an employer's directive to perform work. And while there is undisputed evidence that the company imposed various quality and consistency standards, the drivers also had complete latitude in some areas (such as their choice of routes) and some latitude in others (such as the make and age of the vehicles). As to whether the work was performed "outside the usual course of business" of LimoLink, the issue depends in part on how that business is defined: whether, for example, LimoLink is a company that "manages reservations" (as it describes itself) or a company that provides limousine services. Finally, as to whether the drivers were "customarily engaged in an independently established" trade or business, there is evidence, as noted, that the drivers had been in the business for some time, that they formed separate corporations, that they performed other chauffeur services, and that the drivers owned, maintained, and insured their own vehicles.

In summary, based on the record evidence, the Court cannot conclude as a matter of law whether plaintiffs were employees or independent contractors. Plaintiffs' motion for summary judgment as to Count One and LimoLink's motion for summary judgment as to Counts One, Two, and Four will therefore be denied.

### 2. Whether LimoLink Withheld Tips in Violation of the Massachusetts Tips Act

As noted, prior to 2014 LimoLink charged its customers a gratuity—typically 20% of the

amount charged to the customer—that it then retained as part of its general revenue stream.  The

gratuity LimoLink paid to its vendors was separately determined, typically 20% of the base rate

it paid the vendor.  Under the Massachusetts Tips Act:

> [i]f an employer or person submits a bill, invoice or charge to a patron or other
> person that imposes a service charge or tip, the total proceeds of that service charge
> or tip shall be remitted only to the wait staff employees, service employees, or
> service bartenders in proportion to the service provided by those employees.

Mass. Gen. Laws ch. 149, § 152A(d).  The Act defines "service charge" as:

> a fee charged by an employer to a patron in lieu of a tip to any wait staff
> employee, service employee, or service bartender, including any fee designated as
> a service charge, tip, gratuity, or a fee that a patron or other consumer would
> reasonably expect to be given to a wait staff employee, service employee, or
> service bartender in lieu of, or in addition to, a tip.

*Id.* § 152A(a).

The statute is to be interpreted to serve its purpose of "ensur[ing] that service employees

receive the tips, gratuities, and service charges that customers intend them to receive."  *DiFiore*

*v. American Airlines, Inc.*, 454 Mass. 486, 491, 491 (2009).  There is little doubt that the typical

LimoLink customer who paid the 20% mandatory gratuity charge expected that the entire

gratuity would go to the driver.  Nonetheless, plaintiffs can only recover if their claim fits within

the terms of the statute.

### a.    "No Managerial Responsibility"

The first issue is whether the drivers were "service employees" within the meaning of the

Tips Act.  The statute defines "service employee" as

> a person who works in an occupation in which employees customarily receive tips
> or gratuities, and who provides service directly to customers or consumers, but
> who works in an occupation other than in food or beverage service, and who has
> no managerial responsibility.

Mass. Gen. Laws ch. 149, § 152A(a).  The drivers plainly satisfy the requirements of working

"in an occupation in which employees customarily receive tips or gratuities" and providing "service directly to customers or consumers." LimoLink contends, however, that plaintiffs are not "service employees" under the Tips Act because they have managerial responsibilities.

The First Circuit has held that the Act's unambiguous exclusion of persons with managerial responsibility creates a "bright-line rule": "[n]o means 'no,' and we interpret that easily understood word in its ordinary sense: 'not any.'" *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 134 (1st Cir. 2012) (interpreting identical language in Act's definition of "wait staff employee") (quoting Mass. Gen. Laws ch. 149, § 152A(a)). Thus, even persons who perform mostly customer-service work are excluded from the Act's definition of "service employees" if they perform *any* managerial responsibilities. *See id.* at 36 (holding that shift managers at Starbucks are not service employees despite spending much of their time waiting on customers); *DePina v. Marriott Intern., Inc.*, 2009 WL 8554874, at *11 (Mass. Super. Ct. July 28, 2009) (holding that hotel's "banquet captains" are not service employees despite spending some time waiting on guests).

The Tips Act does not, however, define what type of conduct constitutes "managerial responsibility." Interpreting identical language in the Act's definition of "wait staff employee," the Massachusetts Attorney General has concluded that "[m]anagerial responsibilities can include supervising banquet events, making or influencing employment decisions, scheduling shifts or work hours of employment, supervising employees and assigning servers to their posts." An Advisory from the Attorney General's Fair Labor and Business Practices Division on an Act Protecting the Wages and Tips of Certain Employees, 2004/3 ("Advisory 2004/3") at 2. The Advisory also states that "[t]he Attorney General will look to 29 C.F.R. 541.1 . . . and relevant law for interpretative guidance to define the term 'managerial responsibility.'" *Id.* at 2 n.3.

Section 541 of Title 29 of the C.F.R. defines "management" to include such functions as interviewing and selecting employees, setting their hours and rates of pay, directing their work, apportioning work between employees, determining the types of supplies or equipment to use, and planning and controlling the budget. 29 C.F.R. § 541.102.[6]

The fact that the drivers have their own companies, in which they exercise managerial responsibilities, is the principal complicating factor here.[7] There is no evidence that they exercised managerial responsibilities over the affairs of LimoLink itself. Plaintiffs contend that the existence of those companies is irrelevant, and the situation should be treated as if the drivers held a second job, unrelated to LimoLink. LimoLink contends that because plaintiffs have managerial responsibilities in relation to their own limousine companies, they cannot be "service employees" under the statute.

The statute itself is ambiguous. It could be interpreted to mean (as LimoLink contends) that any person with any managerial responsibility of any kind in the overall enterprise that generated the gratuities is not a "service employee." That interpretation has some superficial appeal; presumably, any bill to which a gratuity was appended was for services performed by the entire enterprise (including the drivers), not just those performed by the company (LimoLink) that actually sent the bill. Alternatively, the statute could be interpreted to mean (as plaintiffs contend) that it exempts only those persons who have managerial responsibility with the "employer or person" submitting the bill that charges a gratuity to customers. LimoLink, of course, was the "person" imposing the gratuity charge, and the drivers did not have managerial

---

[6] The Attorney General's Advisory specifically lists "taxicab drivers" as an example of "service employees." Advisory 2004/3 at 2.

[7] As to their own companies, plaintiffs are more than mere drivers; for example, they make budgetary decisions and, on at least some occasions, make decisions regarding hiring and supervising other employees.

responsibilities for or within LimoLink. They did not, for example, hire LimoLink employees or plan or control LimoLink's budget.

Under the circumstances, the Court will resolve the ambiguity in accordance with the purpose of the statute, which is to ensure that service employees actually receive the gratuities that customers intend them to receive. *See DiFiore*, 454 Mass. at 491. Again, there can be little doubt that the limousine passengers who paid the 20% gratuity charge expected and intended that the payment would go to the driver of the limousine, not that it would be transferred in its entirety to Limo Link. Accordingly, and based on the undisputed evidence, plaintiffs qualify under the Tips Act as "service employees."[8]

### b.      Remittance "in Proportion to Services Provided"

LimoLink further contends that even if the Tips Act applied, it complied with the requirements of the statute. As noted, the Tips Act states that "[i]f an employer or person submits a bill, invoice or charge to a patron or other person that imposes a service charge or tip, the total proceeds of that service charge or tip shall be remitted only to the . . . service employees . . . in proportion to the service provided by those employees." Mass. Gen. Laws ch. 149, § 152A(d).

According to LimoLink, it remitted to the drivers a gratuity in proportion to the value of the services they provided. It contends that the gratuity charged to customers was a percentage (typically 20%) of the total fee for all customer services provided by its employees, such as

---

[8] The Court has thus concluded that plaintiffs are "service employees" under the Tips Act because they perform no managerial responsibilities for LimoLink itself. That interpretation, however, creates the potential for an anomalous outcome. If plaintiffs are ultimately found to be "employees" of LimoLink for purposes of the Massachusetts wage statutes, they will be "employees" for those purposes notwithstanding the fact that they exercise managerial responsibilities (such as purchasing and insuring vehicles) on behalf of the overall enterprise. That anomaly, should it come to pass, is the product of the different wording and purposes of the relevant statutes, which need not be harmonized in all relevant respects.

booking reservations and communicating with customers, not just the Massachusetts-based transportation services provided by plaintiffs. Thus, it contends that the gratuity it paid to plaintiffs, which was typically 20% of the base rate it paid to them, was "in proportion to the services provided by those employees," as required by the Tips Act. According to LimoLink, interpreting the Tips Act to require remitting to plaintiffs the entirety of the gratuity charged to customers would give them an unfair windfall.

LimoLink's position is not supported by the language of the statute. Under the terms of the Tips Act, the "total proceeds" of the service charge billed to customers must be remitted to "service employees." There is no evidence that any of the customer-service employees, who are based in Iowa, work in occupations "in which employees customarily receive tips or gratuities." The entire gratuity must therefore be paid to "service employees," and its customer-service employees do not qualify as such. Furthermore, it is undisputed that the gratuity LimoLink charged to its customers before 2014 was not apportioned among its service employees, but rather went, undifferentiated, into its general revenue stream. (*See* Vittetoe Dep. at 195-96 (explaining that LimoLink retained the gratuity charged to customers as part of its general revenue stream)). Thus, some portion of the gratuity charged to customers in Massachusetts went, indirectly, not only to LimoLink's Iowa-based customer-service employees, but also to its managers and directors. That is clearly contrary to the Act. *Cf. Williamson v. DT Mgmt, Inc.*, 2004 WL 1050582, at *11 (Mass. Super. Ct. Mar. 10, 2004) ("Any payments from [service charges imposed on customers] to management, the house, or others not engaged in the service of food or beverages as their primary duty for the particular event is a violation of the Massachusetts Tips Statute.").

LimoLink further contends that because its customer-service employees are in Iowa, they

are not subject to the Massachusetts Tips Act. Again, however, the Act states that the "total proceeds" of any gratuity charged to customers must be remitted to service employees. If only some of the relevant service employees are covered by the Massachusetts Tips Act, then the total proceeds must be remitted to them. To the extent that this creates a "windfall" to plaintiffs, that does not change the analysis. *See Cooney v. Compass Group Foodservice*, 69 Mass. App. Ct. 632, 638-39 (2007) (rejecting argument that Tips Act should not be applied where it would create seemingly unfair "windfall" to plaintiffs and stating that, in creating Tips Act as a "type of 'strict liability' statute, "the Legislature must be presumed to have factored into its calculus the risk of such results").

Accordingly, summary judgment in favor of plaintiffs will be granted as to liability under the Tips Act, and LimoLink's motion for summary judgment in its favor as to that issue will be denied.

**B.      Claims under Federal Law**

Counts Five, Six, and Seven allege that plaintiffs were misclassified as independent contractors, that LimoLink failed to pay them overtime, and that LimoLink improperly retained gratuities, all in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203, *et seq.* The FLSA guarantees that covered employees receive a minimum of one-and-one-half times their regular rate of pay for hours worked in excess of forty in any workweek. *Id.*, § 207(a)(1). It also provides that employers may use an employee's tips to fulfill part of their hourly wage obligations to that employee, known as taking a "tip credit," if the employer (1) informs the employee of the statute's tip-credit provisions and (2) allows the employee to retain all tips he or she has received, unless the employee participates in a valid tip-pooling scheme with other employees who "customarily and regularly receive tips." *See* 29 U.S.C. § 203(m); *Cumbie v.*

*Woody Woo, Inc.*, 596 F.3d 577, 580 (9th Cir. 2010). In 2011, the Department of Labor

promulgated a regulation extending the statute's tip-pool restrictions to all employers, regardless

of whether they take a tip credit. 76 Fed. Reg. 18,832, 18,841-42, 18,855 ("The employer is

prohibited from using an employee's tips, whether or not it has taken a tip credit, for any reason

other than that which is statutorily permitted in section [20]3(m): As a credit against its

minimum wage obligations to the employee, or in furtherance of a valid tip pool.").

To state a valid FLSA claim, the complaint must allege (1) that they were employed by

the company; (2) that their work involved interstate activity; and (3) that they performed work

for which they were under-compensated. *Id.*, §§ 206(a), 207(a)(1); *Pruell v. Caritas Christi*, 678

F.3d 10, 12 (1st Cir. 2012). LimoLink has moved for summary judgment on all three of the

FLSA claims on the ground that plaintiffs are not employees under the Act. Alternatively, it has

moved for summary judgment on Count Seven, the claim for misappropriation of tips, on the

grounds that there is no independent cause of action for misappropriation of tips under the Act.

### 1. Whether Plaintiffs are Employees or Independent Contractors under the FLSA

In determining whether an employment relationship exists for the purposes of the FLSA,

courts look "not to the common law conceptions of that relationship, but rather to the 'economic

reality' of the totality of the circumstances bearing on whether a putative employee is

economically dependent on their alleged employer." *Baystate Alt. Staffing, Inc. v. Herman*, 163

F.3d 668, 675 (1st Cir. 1998). While the First Circuit has not established a test for determining

whether workers are employees or independent contractors under the FLSA, courts generally

consider the following factors:

> (1) the degree of the alleged employer's right to control the manner in which the
> work is to be performed; (2) the alleged employee's opportunity for profit or loss
> depending upon his managerial skill; (3) the alleged employee's investment in

> equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business.

*Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991); *accord Herman v. Express Sixty-Minute Delivery Service, Inc.*, 161 F.3d 299, 303 (5th Cir. 1998); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988). No one factor is dispositive, and whether a worker is an employee or an independent contractor must be determined based upon totality of the circumstances. *See Selker Bros.*, 949 F.2d at 1293; *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311, 324 (S.D.N.Y. 2001). "The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Superior Care, Inc.*, 840 F.2d at 1059.

"The existence and degree of each factor is a question of fact[,] while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law." *Id.* The inquiry is necessarily fact-intensive, but may be decided on summary judgment when there is no dispute as to the material facts. *See, e.g. Saleem v. Corporate Transp. Group, Ltd.*, 52 F. Supp. 3d 526, 543 (S.D.N.Y. 2014); *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 677 (D. Md. 2000).

Here, and as with the state-law claims, there are several disputed issues of material fact as to the question of whether plaintiffs were in fact employees. In particular, there are disputes as to the employer's right of control, which is "clearly a crucial factor in determining whether an employment relationship exists." *Carter v. Dutchess Cmty. Col.*, 735 F.2d 8, 12 (2d Cir. 1984). For example, the parties dispute the extent to which plaintiffs were actually able to set their own schedules, and "whether a worker is 'free to set his own schedule and take vacations when he wished'" is "particularly relevant to the control factor." *Saleem*, 53 F. Supp. 3d 526, 537

(quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 171 (2d Cir. 1998)). Similarly, the extent to which plaintiffs were free to turn down rides is also disputed. *See id.* at 537 (noting that ability to decline jobs with no or minimal reprimand is indicative of independent-contractor status). In addition, the parties dispute the extent to which plaintiffs were able to participate in setting the price for their services. *See Selker Bros.*, 949 F.2d at 1294 (noting that ability to set prices is indicative of control).

The other factors appear to point in opposite directions. As to plaintiffs' opportunities for sharing in profits or losses, it appears that LimoLink did not guarantee plaintiffs a certain amount of work, and that plaintiffs could, at least to a significant extent, control their own profits by agreeing to accept more jobs. Thus, that factor weighs in favor of finding independent-contractor status. *See Saleem*, 52 F. Supp. 3d at 539 (finding that absence of guaranteed amount of work and drivers' ability to control how much money they earned as a result of the number of jobs they took suggest independent-contractor status).

Plaintiff's investment in their own equipment also weighs in favor of finding independent-contractor status. Plaintiffs purchased and maintained their own vehicles and paid their own insurance premiums, which entail "considerable costs" not normally borne by employees. *Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d at 675.

Similarly, the lack of permanence in the working relationship between plaintiffs and LimoLink weighs in favor of finding independent-contractor status. It is undisputed that the parties could terminate their agreement at will. *See Saleem*, 52 F. Supp. 3d at 542; *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 610 (E.D.N.Y. 2012).

On the other hand, it does not appear that driving for LimoLink requires the kind of special skill that is typically indicative of an independent contractor. *See Gustafson v. Bell*

*Atlantic Corp.*, 171 F. Supp. 2d 311, 326 (S.D.N.Y 2001) (stating that plaintiff's duties as a

chauffeur required no specialized skill); *Saleem*, 52 F. Supp. 3d at 541 (stating that "driving is

not a specialized skill"). Furthermore, while courts sometimes discuss that factor in terms of

"initiative" as well as skill, it does not appear that driving for LimoLink requires the same kind

of initiative that courts find indicative of an independent contractor. *Compare Saleem*, 52 F.

Supp. 3d at 542 (noting that fact that drivers were required to take affirmative steps, such as

"booking into a zone, calling the MTA hotline, or waiting on one of the high-volume lines at

points around Manhattan" required the exercise of independent initiative") *with Arena v.

Plandome Taxi Inc.*, 2014 WL 1427907, at *6 (E.D.N.Y. April 14, 2014) (noting that fact that all

trip arrangements were made by the taxi company suggests that drivers did not need to exercise

independent initiative).[9]

Finally, whether plaintiffs' services were an integral part of LimoLink's business, and the

weight to be assigned to that factor, appears to depend in large part on the definition of the

business. LimoLink defines its business as the management of reservations; if that is correct, the

drivers are arguably not an integral part of the business. Although drivers are of course

necessary to the success of the entire enterprise, the same could be said of many independent

contractors or subcontractors (such as, for example, electricians or plumbers on a construction

job). On the other hand, if the business is defined as providing limousine services, chauffeurs

are obviously an essential part of any such business. *See Saleem*, 52 F. Supp. 3d at 543.

In summary, the combination of disputed facts, factors pointing towards independent-

---

[9] The replaceability of workers—even those who provide essential services—may suggest independent-contractor status. *See Delux Transp. Servs. Inc.*, 3 F. Supp. 3d at 13. Here, there is at least some evidence that LimoLink experienced difficulty replacing plaintiffs' services when they were unavailable. (*See* Pl. Ex. 14 at 9308 (2013 e-mail from Vittetoe to others at LimoLink noting "insufficient IO [independent operator] supply"); *id.* at 9584 (e-mails between LimoLink employees regarding plaintiff Sharma's reduced volume, stating "[w]e definitely need him, it's rough in that market when one of the top IO's is always unavailable so the work is definitely there for him if he wants it.").

contractor status, and factors pointing toward an employer-employee relationship preclude the granting of summary judgment on Counts Five and Six.

### 2. Whether the FLSA Provides a Cause of Action for Misappropriation of Tips

The FLSA provides that employees may initiate actions against their employers for violations of certain of its substantive protections. Specifically, it states that "[a]ny employer who violates the provisions of section 206 [minimum wage provisions] or section 207 [overtime compensation provisions] of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation" and that "[a]ny employer who violates the provisions of section 215(a)(3) of this title [retaliation provisions] shall be liable for such legal or equitable relief as may be appropriate . . . ." 29 U.S.C. § 216(b). "There is no federal cause of action for unlawful retention of tips." *Azeez v. Ramaiah*, 2015 WL 1637871, at *6 (S.D.N.Y. April 9, 2015).

As noted above, 29 U.S.C. § 203(m) and accompanying regulations prohibit employers from using an employee's tips for any reason other than: (1) as a credit against its minimum wage obligations or (2) in furtherance of a valid tip pool. *See* 76 Fed. Reg. 18,832, 18,841-42, 18,855. Plaintiffs contend that the FLSA creates a cause of action for violations of § 203(m). In support of that position, they rely primarily on a Department of Labor *amicus* brief filed in *Jahir v. Ryman Hospitality Indus., Inc.*, 2015 WL 191535 (4th Cir. Appellate Brief, Jan. 2015). There, the Department of Labor stated that "because plaintiffs are not pursuing minimum wage claims or overtime claims, but instead seek only to collect improperly withheld tips, they do not have a cause of action under the FLSA. There is no cause of action under the relevant provision, 29 U.S.C. § 216(b), for a freestanding 'tip' claim under 29 U.S.C. § 203(m) that is divorced from a minimum wage claim or an overtime claim." *Id.* at *12. Plaintiffs contend that they have a

cause of action for unlawful retention of tips because they have also asserted an overtime claim and are therefore not asserting a "freestanding" tips claim.

Plaintiffs' position is contrary to the statutory language, and their reliance on the Department of Labor's *amicus* brief is misplaced, to say the least. The Department's brief is best read as addressing a current split among courts as to whether employees whose employers do not take a tip credit may deduct the value of tips retained by their employer in calculating the wages paid to them for the purpose of asserting either a minimum-wage claim or an overtime claim. The majority of courts to have addressed the issue have held that the Department's 2011 regulation, which extended the tip-retention restrictions of section 203(m) to all employers, regardless of whether they take a tip credit, is invalid; those courts have held that, for that reason, plaintiffs whose employers do not take tip credits may not deduct retained tips when calculating their wages paid. *See, e.g., Malivuk v. Ameripark, LLC*, 2016 WL 3999878, at *3-4 (N.D. Ga. July 26, 2016), *appeal docketed*, No. 16-16310 (11th Cir. Sept. 27, 2016). The Department of Labor's position appears to be simply that its regulation is valid and that plaintiffs may therefore deduct any retained tips from their wages for purposes of asserting minimum-wage and overtime claims. In other words, the Department appears to contend only that a violation of section 203(m) can be relevant to a minimum-wage claim and/or an overtime claim, not that the statute creates a separate cause of action for that violation.

In any event, the statutory language, not the Department of Labor's litigating position, controls. The statutory language is clear that private individuals may bring actions under the FLSA to enforce the provisions of sections 206, 207, and 215(a)(3). The statute does not, however, create a cause of action to enforce section 203(m). "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create

a right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). Thus, LimoLink's motion for summary judgment will be granted as to Count Seven.[10]

## IV.    Conclusion

For the reasons stated above, the motion for summary judgment of plaintiffs Chebotnikov, Pantyukhin, and Sharma is GRANTED as to Count Three (their claims for liability under the Massachusetts Tips Act, Mass. Gen. Laws ch. 149, § 152A), and is otherwise DENIED.  The motion for summary judgment of defendant LimoLink is GRANTED to the extent it seeks summary judgment on Count Seven (misappropriation of tips under the FLSA), and otherwise DENIED.

**So Ordered.**


                                        /s/ F. Dennis Saylor
                                        F. Dennis Saylor IV
Dated: July 6, 2017                     United States District Judge

---

[10] The Court does not now address the issue of the 2011 regulation's validity or whether any alleged retention of tips by LimoLink may be used when calculating the overtime compensation allegedly owed to plaintiffs.